IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | CASE NO.  1:04 CV 1403 |
| Plaintiff, | ) ) | |
| v. | ) ) | JUDGE DONALD C. NUGENT |
| CARNEGIE TRADING GROUP, LTD., *et al.*, | ) ) | MEMORANDUM OPINION |
| Defendants. | ) | |

This matter is before the Court subsequent to a bench trial held from June 17, 2005 through

June 23, 2005.  Thereafter, the parties have filed post trial briefs on Plaintiff's claim and Defendants'

defenses.  Plaintiff Commodity Futures Trading Commission ("CFTC") filed this action against

Defendants The Carnegie Trading Group, Ltd., Inc., ("Carnegie"), John Glase, Reid Henshaw and

John Hollenbaugh seeking injunctive and other equitable relief and civil penalties under the Commodity

Exchange Act, as amended (the "Act"), 7 U.S.C. §1, *et seq*.  Plaintiff alleges that former Carnegie

employees, Reid Henshaw and John Hollenbaugh, made false and misleading sales solicitations by

touting enormous profit potential with minimal or no risk and distributed false and misleading

advertisements regarding a trading program in violation of Sections 4b(a)(2)(i) and (iii) and 4c(b) of the

Act and Regulation 33.10, 17 C.F.R. § 33.10 (2003).  Further, the violations of Mr. Hollenbaugh and

Mr. Henshaw were accomplished within the scope of their employment with Carnegie and therefore

Carnegie is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.  Finally, Plaintiff alleges that Mr. Glase is a controlling person of Carnegie and is liable for Carnegie's acts constituting violations of the Act and Regulations.  Additionally, Plaintiff contends that Mr. Glase violated Commission Regulation 166.3, 17 C.F.R. § 166.3 (2003), by failing to supervise diligently the activities of Carnegie's officers, employees, and agents relating to its business as a Commission registrant.  Defendants Hollenbaugh and Henshaw settled with Plaintiff prior to trial.  Plaintiff went to trial against Carnegie and Mr. Glase.

Mr. Hollenbaugh and Mr. Henshaw signed Consent Orders of Permanent Injunction ("Consent Orders") that were filed with the Court on December 14, 2005.  In the Consent Orders, Mr. Hollenbaugh and Mr. Henshaw admit that they violated Sections 4b(a)(2)(i) and (iii) and 4c(b) of the Act and Regulation 33.10.

### FINDINGS OF FACT

CFTC, Carnegie and Mr. Glase submitted the following Joint Stipulations of Uncontested Fact[1]:

1. The CFTC is the independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act.  The CFTC is authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2001), to bring a civil action to enjoin any act or practice constituting a violation of the Act, to enforce compliance with the Act, and to seek civil penalties.

2. Defendant Carnegie is an Ohio corporation, incorporated in February 1997 with its

---

[1]

Not all of the stipulated facts have been reprinted here.  Accordingly, the numbering has been changed from the document submitted by the parties.

principal place of business at 1701 East 12th Street, Cleveland, Ohio.  Carnegie operated pursuant to a

guarantee agreement with LFG, LLC ("LFG"), which was purchased by Refco, Inc., ("Refco"), a

registered futures commission merchant ("FCM"), from 1997 until July 2003, when Carnegie became a

guaranteed introducing broker ("IB") of Man Financial, Ltd. ("Man"), a registered FCM.  As a result,

all of Carnegie's customers maintained accounts at LFG, Refco or Man.  At various times during the

relevant period, Carnegie's Branch Offices were located in Canal Fulton, Columbus and Barberton,

Ohio and St. Petersburg, Florida and San Diego, California ("Branch Office").

     3. John Glase currently resides in Bay Village, Ohio.  He is president and has been at least a

45% owner of Carnegie since February 1997.  Mr. Glase has been registered with the Commission as

an associated person ("AP") of Carnegie since March 17, 1997.

     4.  John Hollenbaugh rejoined Carnegie as an AP in July 2002 and was the manager of

Carnegie's Canal Fulton, Ohio branch office from July 2002 until September 2003, when the office

closed, and Hollenbaugh voluntarily withdrew his AP registration.

     5.  From its commencement in February 1997 until in or about November 2001, Carnegie's

principals were Mr. Glase and William Edwards.  A third principal was Seth Hirschfeld, who owned

9% of Carnegie's capital stock.

     6.  Mr. Glase began trading in commodities in 1972, and has been continuously engaged in the

industry since then.  He was registered through Merrill Lynch from 1983-96, where he was Vice

President in charge of regional futures and options trading until the Merrill Lynch commodity division

closed; then with JC Bradford, whose commodity division closed during 1997.  He has never been

subject to disciplinary proceedings before the National Futures Association ("NFA") or any exchange.

He has testified as an expert on copper hedging in civil litigation.

7.  Mr. Hollenbaugh and Mr. Henshaw worked at the Branch Office in Canal Fulton, Ohio.

8.  Each Branch Office had a Branch Office Manager.  In order to become registered with the CFTC as an AP a person must take and pass the Series 3 exam.  To be designated as a Branch Manager with the NFA a person must pass the Series 3 exam.

9.  No applicant was fully registered as an AP by the NFA until the Series 3 examination was successfully completed, at which time the applicant would be registered as an AP.

10.  NFA audited Carnegie's main office in Cleveland in 1999 and 2002.  NFA also audited Carnegie's Canal Fulton office in 2002.  Refco engaged Compliance Supervisors, Inc. of New Jersey to perform on-site inspections of both Cleveland and Canal Fulton offices in 2001, Cleveland in 2002, and both Cleveland and Canal Fulton in 2003.

11.  As to Carnegie's Canal Fulton Branch Office, NFA's audit was followed by a letter addressed to the Branch Office manager of Carnegie.

12.  The Canal Fulton Branch Office used LFG-Refco's equity runs, trade tickets and computerized AIM and LEO systems.

13.  The Canal Fulton branch was initially an outgrowth of the Barberton Branch Office, managed by Chris Masterson from 1999 until in or about August 2000.  Canal Fulton was then established and conducted trading until February 2001, when Mr. Masterson, Mr. Hollenbaugh and others formed Phoenix Trading Group of Ohio, Inc., ("Phoenix").  Mr. Hollenbaugh returned to Carnegie in or about July 2002.  Canal Fulton had no more than five APs at any time, at least three of whom, i.e. Mr. Hollenbaugh, Anthony Harris and Keith Hale, were designated branch managers with

4

NFA.

14.  The designated Branch Office manager of the Canal Fulton Branch Office during 2003 was Mr. Hollenbaugh, who was initially hired by Carnegie in 1999.  Mr. Hollenbaugh became Vice President and Principal with Phoenix in February 2001 and rejoined Carnegie in July 2002.  He was designated as a branch manager for Carnegie as early as September 2000, and was again designated as a branch manager on September 6, 2002.

15.  Mr. Henshaw first registered as an AP with Phoenix on June 2, 2002.  When Mr. Hollenbaugh returned to Carnegie as branch manager of Canal Fulton, he brought with him Mr. Henshaw, who was registered as an AP of Carnegie on October 30, 2002.

16.  In or about July 2002, Mr. Hollenbaugh and others formed Triple H Commodities, Inc. ("Triple H").

17.  Mr. Glase was neither a shareholder, director, officer nor employee of Triple H.

18.  Each month from July 2002 forward, LFG-Refco sent a commission check to Carnegie for trades brokered by Carnegie during the preceding month, specifying Canal Fulton's trades.  Carnegie would forward the commissions due on trades generated by Canal Fulton to the Canal Fulton branch, less a transactional fee of $5.00 to Carnegie.

19.  When Carnegie employees solicited orders from customers, they also provided specific trade recommendations to customers.

20.  Mr. Glase provided APs in the Cleveland office with trade recommendations that were used by those APs to solicit trades by customers or potential customers at least 50% of the time.

21.  Mr. Glase frequently developed and communicated trade recommendations to managers of

5

Carnegie's branch offices.

22.  In at least February 2001, Carnegie employees provided customers with E-mini S&P 500 promotional material stating that a Carnegie customer earned 306% profit from April 1999 through February 2001 utilizing a proprietary trading program in S&P 500 futures.

23.  Mr. Glase did have and exercised control of Carnegie's Cleveland, Ohio office.  Mr. Glase believed Mr. Edwards' recommendations to be "pretty bad" most of the time.  He told Mr. Edwards on many occasions to desist from recommendations.

24.  Mr. Glase maintained in the Cleveland office a policy manual published by Refco, LLC ("Manual").

25.  Until November 2001, Mr. Glase and Mr. Edwards shared administrative responsibilities. Mr. Glase trained new brokers, did the trading and handled the bookwork.  Mr. Edwards' scope of responsibility included solicitation of new customers over the phone.

26.  Mr. Glase and Mr. Edwards were joint signatories on the Carnegie bank account from February 1997 to November 2001.  Mr. Glase and Mr. Hirshfeld were signatories on the account after November 2001.

27.  Since November 2001, Mr. Glase supervised the APs in Carnegie's main office.

28.  Mr. Glase was responsible for customer complaints, whether arising in Cleveland or in Branch Offices.  The response to customer complaints could range from arbitration to broker discipline.

29.  On December 19, 2001, Mr. Glase executed a 15 day trading restriction as to an AP in the St. Petersburg Branch Office, indicating: "This is a formal reprimand and will be made a part of your permanent record."

6

30.  Mr. Hollenbaugh trained a new recruit in Canal Fulton.  He went over "Series 3 material" and the NFA Manual.  He followed up by having her listen to others on the telephone and observed her telephone solicitations thereafter.

31.  Canal Fulton maintained copies of the Carnegie's anti-money laundering and privacy policies, and maintained on site the compliance and operations manuals of associated FCMs.  One of the APs at Canal Fulton was Keith Hale who had been in Carnegie's Branch Office at Barberton, Ohio in 2000.

32.  Mr. Henshaw and Mr. Hollenbaugh are no longer engaged in options and futures trading.

In addition to the stipulated findings submitted by the parties, the Court makes the following findings of fact:

33.  Most of the alleged violations of the Act by Mr. Hollenbaugh and Mr. Henshaw occurred in the time period of July 2002 through March 2003.[2]  Mr. Hollenbaugh returned to Carnegie as branch manager of the Canal Fulton office, bringing Mr. Henshaw with him in late July 2002.  Until the complaint involved in this action, there have been no complaints before any regulatory authority nor any disciplinary proceedings regarding Mr. Glase (since he began selling commodities in 1972), Mr. Edwards or any of their supervised  brokers.

34.  During the July 2002-March 2003 time period, Mr. Hollenbaugh and Mr. Henshaw

---

[2]

Richard Deyoung testified that he was contacted by Mr. Hollenbaugh in June 2002. It is possible that Mr. Deyoung was contacted by Mr. Hollenbaugh while he was affiliated with Phoenix Trading, however, Mr. Deyoung actually opened an account with Refco through Carnegie. Johnny Mercer testified that he opened an account with Carnegie in February 2000 after solicitation by Mr. Hollenbaugh, apparently during Hollenbaugh's  first stint with Carnegie.

exaggerated the magnitude and likelihood of potential profit and downplayed the risk of loss to customers.  The customers who were called at trial testified as follows:

(A)  Lucas Knowles testified that Mr. Hollenbaugh called him to encourage him to invest in options on the yen and told him he could make a 60%-80% return in four to five days.  Mr. Knowles also testified that Mr. Henshaw made similar representations to him about large returns in a short time frame.  Neither Mr. Hollenbaugh or Mr. Henshaw discussed risk with him.  (Tr. 30-31).  Mr. Knowles also testified that he received a fax in June regarding the E-mini S&P 500 option which claimed a 306% gain over the last two years.  Mr. Knowles opened an account in July with a $7900 investment.  Mr. Knowles did not follow the suggested buys of yen or the S&P 500, but did follow other recommendations for trades. Growing up in Iowa and living there his entire life, made him more comfortable trading in soybeans and corn rather than in yen or the S&P 500.  (Tr. 45-46) Mr. Knowles acknowledged receiving and reading the account agreement which discloses the risk of loss and states that Carnegie does not guarantee a profit. (Tr. 38-41)  Eventually, Mr. Knowles sustained a net loss of about $6500.  Mr. Hollenbaugh told Mr. Knowles that if he gave them another $10,000, he would get his loss back for him, guaranteed. Mr. Knowles declined to invest further and stated that if he had been told that 82% of Carnegie's customers closed their accounts at a loss he would not have invested. (Tr. 30-38).

(B) Clarence Tucker, of Festus, Missouri testified that he was contacted by John Hollenbaugh around December 2002.  Mr. Hollenbaugh told him about the S&P 500, e-mini program that had been so successful with a track record of over 300% return.  Mr. Hollenbaugh also mentioned the Christopher Cadbury system and the 5% stop loss, which would prevent him from losing all of his

8

money.  Risk was not mentioned by Mr. Hollenbaugh.  Mr. Tucker received an account agreement and information on the Cadbury system.  Given the description of Carnegie having a "proven track record", the 300% return and the 5% stop loss protection, Mr. Tucker decided to open an account and begin trading.  Mr. Henshaw also called Mr. Tucker and mentioned the 300% gain and the proven track record.  No mention of risk was ever made by Mr. Henshaw or Mr. Hollenbaugh.  Mr. Tucker followed the Cadbury system and all trades were recommended by Carnegie.  He eventually lost $9000 of his $20,000 investment.  He stated that if he had been told that 80% of Carnegie customers lost money in 2002, he would not have invested.  (Tr. 48-59).

(C)  Christopher L. Herner testified that he was contacted by Mr. Hollenbaugh and Mr. Henshaw and was promised large profits with no mention of risk.  Mr. Henshaw faxed him the S&P e-mini program with the 300% profit.  Mr. Herner made a $100,000 investment in two installments. After experiencing some losses, Mr. Herner taped some of his conversations with Mr. Henshaw and Mr. Hollenbaugh.  In the taped conversations Mr. Henshaw guaranteed that Mr. Herner would get his money back and that he would be turning over the account to Mr. Glase, an expert in the cocoa markets, who would make back his money.  Mr. Henshaw gave his personal guarantee.  Mr. Herner played the tape for Mr. Glase who offered to take money from Mr. Henshaw and Mr. Hollenbaugh, invest it and pay Mr. Herner back over a three to four month period. Thereafter Mr. Herner contacted an attorney and he was eventually reimbursed all but $16,000 of his $100,000 investment.  Essentially, Mr. Herner got his entire investment back less $16,000 in his attorney's fees. Upon receipt of the money, Mr. Herner signed a settlement agreement with Carnegie and/or Refco.  (Tr. 74-93).

(D)  Thomas Vanhoy, of Loggootee, Indiana received a call from Mr. Hollenbaugh in July of

9

2002 about the profit potential in soy beans because of the drought.  Mr. Hollenbaugh told him that if soy beans moved five cents a bushel a $5,000 investment would make $25,000.  Mr. Hollenbaugh told him that he could not guarantee a profit but that the way his clients had been making money, he would make quite a bit of money with him as well.  Mr. Vanhoy invested $10,000 in August 2002.  After his first trade, he spoke only to Mr. Henshaw.  Mr. Vanhoy invested another $8,000 after Mr. Henshaw told him that he could get him even with the new money and that if he did not send him the money he was going to lose $12,000-$13,000.  On September 25, 26, 2002, Mr. Vanhoy asked Mr. Henshaw to send him the $3,400 left in his account.  If he had been informed that 82% of Carnegie's customers had lost money, he would not have invested. (Tr. 123-131).

(E) Richard Deyoung of Brookfield, Wisconsin was contacted by John Hollenbaugh in June 2002.  Mr. Hollenbaugh encouraged him to invest in futures and options because unlike stock brokers, Carnegie only received commissions when a client makes money and with their team of analysts it's almost a 100% guarantee that you'll get two, three, four times your investment.  Mr. Hollenbaugh thought that he could make three to four times his $7,000 investment.  Mr. Hollenbaugh downplayed the risk.  Mr. Deyoung told Mr. Hollenbaugh that he could invest the $7,200 in his kids' college account, but it better be a win/win situation.  Mr. Hollenbaugh told him not to worry, that by the end of the year he would be able to pay for all of their college education up front.  Mr. Deyoung received the ad for the S&P 500 trade touting the 306% return. Eventually Mr. Deyoung invested a total amount of $31,100.  After the first trade, Mr. Deyoung dealt solely with Mr. Henshaw.  Mr. Henshaw kept telling Mr. Deyoung to put in more money to get a bigger profit margin.  He lost his entire investment and stated that he never would have invested at all if he knew that 80% of Carnegie customers lost money.

10

(TR. 123-152).

(F) Melvin Werner of Vermilion, Minnesota was called by Mr. Henshaw in November 2002. Mr. Henshaw described the S&P e-mini program and told him the futures market was better and safer than the stock market and he could make a lot more money at a quicker, safer pace.  He said he could make 200% in a year.  Mr. Henshaw did not think risk was anything to be concerned about and did not warn him that he could lose his investment. Mr. Werner invested $16,500 from his kids' college account. Mr. Werner made additional investments at the urging of Mr. Henshaw–$20,000 for a yen trade where Mr. Henshaw told him he could make a lot of money quickly; another $20,000 for a 30 year treasury deal because Mr. Henshaw told him he would make the buy for him before he got his check and that within two to three days they'll have a check back to Mr. Werner to cover the $20,000 check; and finally for $25,000 for a gold purchase just prior to the start of the Iraqi war.  Mr. Henshaw kept assuring Mr. Werner that they would come out of the losses.  Mr. Henshaw kept telling Mr. Werner that the investments were safe, that he was putting his mother into it.  Eventually, Mr. Werner was busy with his business and the calls from Mr. Henshaw tapered off and Carnegie eventually closed his account. Mr. Werner stated that if he had been told that approximately 88% of Carnegie's customers lost money in 2001 when he was first contacted, he would never have invested with Carnegie.  (Tr.133-169).

(G) Michael Hoyt from Spence, Iowa testified that he was called by Mr. Hollenbaugh in July 2002 who told him how much better it was to invest in commodities rather than stocks because you could realize a 150 to 200% return on investment within weeks.  Mr. Hoyt specifically asked about the downside risk of investing in commodities and was told that the worst case scenario would be to break

11

even or lose a little bit of money because of the commissions.  He was never told that he could lose every penny he invested.  He first invested $10,000 in mid August, 2002 after Mr. Henshaw called him and told him about a copper deal that he could almost guarantee four times the return on investment within a matter of a couple weeks.  He told Mr. Henshaw he would not invest any more until they proved themselves in the first investment.  However, Mr. Henshaw reached Mr. Hoyt's wife and induced her to invest $20,000 in soy beans.  Despite following Mr. Henshaw's recommendations, except for investing more money, Mr. Hoyt's account steadily lost money and he closed it out with a balance of $960.00 after nine months.  Mr. Hoyt spoke with Mr. Glase about his losses.  Mr. Glase said he would look into it.  Mr. Glase called Mr. Hoyt and told him that a cocoa trade had been done wrong and reimbursed his money from that trade–about $2,200. Mr. Hoyt signed a release of Refco and Carnegie after receiving the money.  Mr. Hoyt said he would not have invested if he had been told up front that 80-82% of Carnegie's customers closed their accounts at a loss. (Tr. 181-192)

(H) David Kreamer, of Shreveport, Louisiana, testified that he was called by Mr. Henshaw in August 2002 and was told he could triple his investment in a few weeks.  He was faxed the S&P flyer touting the 306% return.  There was no discussion of risk.  Mr. Henshaw told him if he invested $6000 he could triple it in a really short time.  After opening an account with $6,000 they started trading with T bonds and then some other options and ended up with soy beans.  Mr. Kreamer made a profit.  He got nervous in September and withdrew first $3,000 and then the other $3,000, leaving a balance of about $2,700, the profits of previous trades, in his account. He closed the account eventually and stated that he would not have invested at all if he had been told that approximately 88% of Carnegie's customers lost money in 2001.(Tr.199-206).

(I) Alan Brett Lively, of Baton Rouge, Louisiana, testified that he was contacted by Will Edwards of Carnegie in June 2001.  Mr. Edward's told him he could expect to make anywhere from 20% to 30% profit on his investment in a month's time.  He was told there was risk in every kind of investment. He also received a call from Steve Mececevic of Carnegie who sent him some information on Carnegie and Carnegie's e-mini S&P trading program.  He invested $15,000 in mid to late June 2001. He followed Carnegie's trade recommendations for the most part and lost about $12,000 when he closed his account.  After he closed his account he received a call from Chris Masterson in August 2001 who said he was with Phoenix Trading.  Mr. Masterson said Phoenix was merging with Carnegie and asked him to invest funds.  Mr. Lively invested $30,000 without really realizing Phoenix Trading was or was about to become Carnegie.  However, after investing the additional $30,000 he discovered he needed the money for another purpose and asked Mike Lingo, his contact at Carnegie, to return the money.  Mr. Lingo did not honor that request immediately so Mr. Lively contacted Refco to request the money back.  Refco complied with that request.  Mr. Masterson called Mr. Lively, apologized for Mr. Lingo's actions and told him that Mr. Lingo would be disciplined.  Mr. Lingo stated that he would never have invested with Carnegie if he knew that approximately 88% of Carnegie's customers closed their accounts at a loss.  (Tr. 274-291).

(K) Johnny Mercer, of Wilmington, North Carolina, testified that he was cold called by John Hollenbaugh in November 1999.  Mr. Hollenbaugh called him repeatedly before he finally invested $25,000 in February 2000.  Mr. Hollenbaugh told him if he just went ahead and got involved in something that it was a sure thing.  He does not remember much discussion of risk.  Mr. Hollenbaugh told him that he could double his investment in a few weeks.  After a couple of weeks the account had

lost a lot of money and Mr. Mercer told Mr. Hollenbaugh that he wanted to get out.  Mr. Hollenbaugh told him to reinvest another $25,000 because something was coming up and that would be a sure thing to get all of his money back.  Mr. Mercer wired Mr. Hollenbaugh another $23,000.  In sum Mr. Mercer lost $48,000 less $733.  Mr. Mercer stated that he never would have invested if he knew that 83% to 84% of Carnegie's customers closed their accounts at a loss. (Tr.485-498).

**ANALYSIS AND CONCLUSIONS OF LAW**

This Court has jurisdiction over this action pursuant to 7 U.S. C. § 13a-1 and 28 U.S.C. § 1331.

### I.  Counts One and Two of the Complaint

CFTC alleged that Carnegie, Mr. Glase, Mr. Hollenbaugh and Mr. Henshaw were liable for fraud in the sale of futures and options contracts in violation of Sections 4b(a)(2)(i) and (iii) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) and 6c(b)  and Regulation 33.10 based upon misrepresentations and omissions of material facts.  Plaintiff also alleged that Carnegie was liable for the fraudulent acts of Mr. Hollenbaugh and Mr. Henshaw under Section 2(a)(1)(B) of the Act and Regulation 166.4.  Finally, Plaintiff contends that Mr. Glase is liable as a controlling person for Carnegie's violations pursuant to Section 13(b) of the Act.

Turning first to the underlying fraud and misrepresentation claims against Mr. Hollenbaugh and Mr. Henshaw, § 6b(a)(2)(i) and (iii) provide in relevant part:

> **(a) Contracts designed to defraud or mislead; bucketing orders**
> It shall be unlawful . . . (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any

14

transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof--

    (i) to cheat or defraud or attempt to cheat or defraud such other person;

    . . .

    (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person;

7 U.S.C. § 6b(a)(2)(i) and (iii).  Section 6c(b) provides that no person shall enter into any transaction contrary to any rule, regulation or order of the Commission.  Regulation 33.10 provides:

It shall be unlawful for any person directly or indirectly:

(a)  To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

    To establish a claim for futures and options fraud under Sections 4b(a) and 4c(b) of the Act, the CFTC must demonstrate that the defendant(s), in connection with commodities transactions,  made a "material" misrepresentation or omission of fact with scienter, *i.e.*, the defendant knew the information was false and calculated to cause harm or recklessly disregarded the truth or falsity of the information. *See Commodity Futures Trading Commission v. Rosenberg*, 85 F. Supp.2d 424, 447 (D. N.J.

2000); *In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) 27,701 at 48, 313 (CFTC July 19, 1999), *aff'd in relevant part and rev'd in part sub nom., Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000).[3]

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed'." *CFTC v. R.J. Fitzgerald & Co., Inc*., 310 F.3d 1321, 1328 (11th Cir. 2002) (citation omitted). A fact is material if a reasonable person would view the information as important in making a trading decision. *Id.* at 1328-29; *Madel v. Anspacher & Anspacher & Associates, Inc*., [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶24,412 at 35, 813 (CFTC Mar. 14, 1989) (citations omitted).

### A. The Misrepresentations and Omissions

The CFTC asserts that the misrepresentations and omissions made by Mr. Hollenbaugh and Mr. Henshaw fall into the following four categories:

(1) exaggerating the magnitude and likelihood of potential profit and downplaying the risk of loss to customers;

(2) failing to inform customers and potential customers that from one year to the next approximately 74% to 94% of Carnegie's customers who traded during the relevant time lost money;

(3) representing to customers that their trade recommendations could result in large profits

---

[3]

The CFTC need not prove customer reliance on material misrepresentations in an enforcement action alleging fraud. Such actions are brought to protect the public interest and not to redress private wrongs. *See Rosenberg*, 85 F.Supp.2d at 446. However, as the CFTC is also seeking restitution for customer losses, reliance/proximate cause will need to be demonstrated to obtain such relief. *Id.* at 447. Relief, including restitution will be addressed later in this opinion.

within short periods of time when they knew or recklessly disregarded that the representations were

false; and

(4) providing a fraudulent or misleading advertisement to customers.

### 1. The False or Misleading Statements

During the relevant time period, Mr. Hollenbaugh and Mr. Henshaw affirmatively

misrepresented profit potential and the risks of trading to potential customers. (Tr. 46-47, Knowles;

Tr. 72-74, Herner; Tr. 51, 67-68, Tucker; Tr. 124, Vanhoy; Tr. 138-139, Deyoung; Tr. 158, Werner;

Tr. 1830184, Hoyt; Tr. 201, Kreamer). For example, Mr. Hollenbaugh and Mr. Henshaw told

customers that they could earn 150% to 200% in a couple of weeks with non-existent risk and Mr.

Henshaw told a customer that he could earn over 300% profit in one year and that he would not lose

any money. (Tr. 51, Tucker; Tr. 183, Hoyt; Tr. 201-04, Kreamer). As the CFTC notes, these kinds

of representations were particularly egregious because Mr. Hollenbaugh and Mr. Henshaw typically

recommended out of the money options on futures to Carnegie's customers and potential customers,

which require unlikely and dramatic price increases in the underlying futures contracts in order to be

profitable. (Tr. 326-327, Harris; Tr. 451, Henshaw)[4] In addition, Mr. Hollenbaugh and Mr. Henshaw

did not inform customers that they were recommending out of the money options to them or explain the

likelihood of earning a profit through trading out of the money options. (Tr. 451, Henshaw).

Similarly, the guarantees offered by Mr. Henshaw to Mr. Herner and Mr. Hoyt that they would

---

[4]

"Out of the money option" is a term used to describe an option that has no intrinsic value, which
is the measure of the value of an option if immediately exercised. For example, a call (right, but
not obligation, to buy a commodity or other asset) at $400 on gold trading at $390 is out-of-the-
money $10. See Commodity Futures Trading Commission Glossary of terms.

break even or make a profit on certain cocoa trades and the representations made by Mr. Hollenbaugh

and Mr. Henshaw that customers could make large profits with minimal or no risk of loss in the context

of futures trading were false because investments in futures transactions necessarily depend on

speculative predictions and risk is unavoidable. *See Munnell v. Paine Webber Jackson & Curtis*,

[1986-1987 Transfer Binder] comm. Fut. L. Rep. (CCH) ¶ 23,313 at 32,863 (CFTC Oct. 8, 1986)

(guarantees of profitability are "inherently fraudulent"); *R&W Technical Services, Ltd., v. CFTC*, 205

F.3d 165, 170 (5th Cir. 2000)(claims of high profits by sellers of computer software for trading

commodity futures amounted to the type of guarantee of profit prohibited by Section 4b(a) of the Act);

see also Commission Regulation 1.56, 17 C.F.R. § 1.56 (FCMs and IBs are prohibited from making

guarantees against loss).

### 2. The Omissions and the Misleading Advertisement

The failure of Mr. Hollenbaugh and Mr. Henshaw to disclose customer losses of 74% to 94%

while simultaneously touting enormous profit potential to customers and prospective customers

constitutes fraud under Section 4b of the Act. *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1332-1333.

(Solicitation devices were fraudulent as a matter of law because they spoke of RJFCO's strategy for

enormous profit potential without simultaneously informing potential RJFCO customers that more than

95% of the firm's clientele lost money in the types of investments being advertised.)  At trial, counsel for

all parties agreed that the law required Defendants to present a balanced presentation to customers and

potential customers.  Thus, whenever Mr. Hollenbaugh and Mr. Henshaw touted large profits and

quick returns with little risk, this duty to balance required them to disclose that approximately 90% of

Carnegie's customers closed their accounts at a loss.

18

The CFTC also complains about an advertisement regarding an e-mini S&P 500 trading program that was provided to Carnegie customers without updating the advertisement to reflect the declining performance of the program.  Six customer witnesses testified that at various times from June 2001 to July 2003, Carnegie employees, including Mr. Hollenbaugh and Mr. Henshaw, provided them with an advertisement claiming that a Carnegie customer, Frank Vestfall, ("Vestfall"), earned 306% profit from April 1999 through February 2001 utilizing a proprietary trading program in S&P 500 futures. (Tr. 31-33, Knowles; Tr. 52-53, Tucker; Tr. 73-74, Herner; Tr. 139-140, 148-149, Deyoung; Tr. 203, Kreamer; Tr. 278-280, Lively; Plaintiff Ex. 1, 2, 57).  The advertisement depicted Vestfall's monthly profits and losses from April 1999 through February 2001 (Plaintiff Ex. 2) and sought customers to trade this program.  Vestfall continued to trade his account pursuant to the trading program after February 2001 and began suffering substantial losses, including $18,971 in March 2001. (Tr. 302, Koprowski; Plaintiff Ex. 73).  Mr. Vestfall's cumulative rate of return for the life of the account was a negative 30.22%. (Tr. 302, Koprowski; Plaintiff Ex. 73).  Mr. Hollenbaugh and Mr. Henshaw continued to distribute the advertisement to at least six customers through January 2003, but failed to update the advertisement to reflect the declining performance of the trading program after February 2001. (Tr. 302-304, Koprowski; Tr. 31-32, Knowles; Tr. 52-53, Tucker; Tr. 73-74, Herner; Tr. 139-140, Deyoung; Tr. 278-280, Lively).  The CFTC's expert witness, Susan Kopowski of the National Futures Association, testified that the advertisement was misleading on its face because it did not present a balanced discussion of profit and risk as required by NFA rule 2-29. (Tr. 302-304, Koprowski).  Further, Ms. Koprowski opined that distributing the advertisement after February 2001 without updating it to reflect Vestfall's losses was misleading, and had she been aware of it she would

19

have issued a disciplinary letter to Carnegie. (Tr. 303, Koprowski).

**B. Materiality of the Misrepresentations or Omissions**

Clearly, the testimony of the Carnegie customers presented at trial demonstrated that the statements made by Mr. Hollenbaugh and Mr. Henshaw regarding the enormous profit potential versus the minimal risk and the potential to make big, quick specific profits were material to their decisions to invest with them.  Similarly, all of the customers testified that they would not have invested with Carnegie if they had been informed that 74% to 94% of Carnegie customers who traded in the relevant time period lost money.  Finally, the e-mini advertisement was important to some of the customers in that it supported the quick profit, huge profit potential representations that Mr. Hollenbaugh and Mr. Henshaw made.  Thus, all of the four categories of misrepresentation/omissions noted above were material to the customers in this case.  That is, the information was important to them in making their trading decisions.  The Court also finds that these kinds of misrepresentations and omissions would be material to the average, reasonable person.  *See CFTC v. Nobel Wealth Data*, 90 F.Supp.2d 676, 686 (D.Md. 2000) (representations about profit potential and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law"), *aff'd in part and vacated in part*, 278 F.3d 319 (4th Cir. 2000).

**C. Scienter of Hollenbaugh and Henshaw**

The scienter element of Sections 4b(a)(2)(i) and (iii) and 4c(b) of the Act is satisfied when representations are made intentionally or with reckless disregard of the truth. *In re Slusser*, ¶27,701 at 48,313 and *Hammond*, ¶24,617 at 36,654. The scienter of Carnegie's agents is attributed to Carnegie under the provisions of 2(a)(1)(B) of the Act.  Scienter has been established in this case because Mr.

20

Hollenbaugh and Mr. Henshaw made representations while soliciting customers knowing that the representations they made regarding profit potential in trading commodity futures contracts and options on futures pursuant to their trade recommendations were false.  (Tr. 451, 453, Henshaw; Tr. 570-571, Hollenbaugh).

### D.  "In Connection With" and "For or on Behalf of" Fraud Requirements

Section 4b requires that fraud be "in or in connection with any order to make, or the making of," a futures contract "for or on behalf of any other person."  Thus, Section 4b applies to fraud, which relates both directly and indirectly to futures transactions. *See Slusser*, ¶27,701 at 48,312, *citing Saxe*, 789 F.2d at 111("[T]he legislative history indicates a progressive trend toward broader application of the CEA."); *Hirk,* 561 F.2d at 103-4 (7th Cir. 1977)("[C]learly Congress has recognized through the years that fraudulent and deceptive conduct in connection with futures transactions can and does occur prior to the actual opening of a trading account and has intended to regulate it by including the "in connection with" language in Section 4b"). Fraud can occur during the solicitation of customers. *Saxe,* 789 F.2d at 111.  The fraud needs to concern the characteristics and attributes that would induce a customer to buy or sell a futures contract. *Kearney v. Prudential-Bache Securities*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988).

In this instance, the representations of high probability of great profit and/or fast profits and minimal risk made by Mr. Henshaw and Mr. Hollenbaugh in their solicitations to trade futures satisfies the "in connection" requirement of 4b.  Mr. Henshaw and Mr. Hollenbaugh made the misrepresentations in order to induce the customers that testified to invest funds or additional funds for the purpose of trading futures and options on futures pursuant to Carnegie's trade recommendations.

21

Based upon the evidence presented at trial, CFTC has established that Mr. Hollenbaugh and Mr. Henshaw are liable for fraud in the sale of futures and options contracts in violation of Sections 4b(a)(2)(i) and (iii) and 4c(b) of the Act and Regulation 33.10 based upon misrepresentations and omissions of material facts as alleged in Counts 1 and 2 of the Complaint.   Having made this initial finding, the Court turns to the allegations of the liability of Carnegie and Mr. Glase for the violations of Mr. Hollenbaugh and Mr. Henshaw.

### E. Liability of Carnegie for the violations of Mr. Hollenbaugh and Mr. Henshaw

The violations of the Act were committed by Mr. Hollenbaugh and Mr. Henshaw in the scope of their employment and agency with Carnegie.  Accordingly, Carnegie is liable for their violations pursuant to Section 2(a)(1)(B) of the Act and Regulation 166.4.  *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986).

### F.  Liability of John Glase as a Controlling Person for the violations of Mr. Hollenbaugh and Mr. Henshaw

CFTC asserts that John Glase is liable as a controlling person for the violations of Hollenbaugh and Henshaw pursuant to Section 13(b) of the Act.  Section 13c(b) provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

Thus, to establish that a defendant controlled a corporation for purposes of § 13c(b), the Commission must show that the defendant (1) controlled, directly or indirectly, the person who violated

the Act, and (2) did not act in good faith or knowingly induced the violations.  In defining the control

necessary for liability under Section 13(b), courts have determined that the CFTC must demonstrate

that a defendant  "actually exercised general control over the operation of the entity principally liable"

*and* "possessed the power or ability to control the specific transaction or activity upon which the

primary violation was predicated, even if such power was not exercised." *CFTC v. Baragosh*, 278

F.3d 319, 333 (4ᵗʰ Cir. 2002) (quoting *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir.1993))

(quoting *Donohoe v. Consol. Operating & Prod. Corp.,* 982 F.2d 1130, 1138 (7th Cir.1992)), and

interpreting *In re Spiegel,* No. 85-19, 1988 WL 232212 (C.F.T.C. Jan. 12, 1988); *see also In re*

*Johns,* No. 01-22, 2001 WL 951733 at *3 (C.F.T.C. Aug. 21, 2001) (same).  A controlling person

"need not actually exercise the power to control unlawful conduct or participate in illegal acts; it suffices

if he enjoys the ability to do so, has actual or constructive knowledge of the violations, and refrains from

acting." *CFTC v. International Financial Services, Inc.*, 323 F.Supp.2d 482, 504 (S.D.N.Y.

2004)(citations omitted).  Whether a defendant had such control depends on all the facts and

circumstances in each case.

  With respect to the element of good faith, Section 13c(b) "does not require the defendant to

prove good faith, but rather requires the Commission to prove "lack of good faith." *Monieson,* 996

F.2d at 858. The Seventh Circuit has said that "[a] controlling person acts in bad faith if he did not

maintain a reasonably adequate system of internal supervision and control ... or did not enforce with any

reasonable diligence such system." *Monieson,* 996 F.2d at 860 (internal quotation marks omitted).

  It is clear that Mr. Glase exercised general control over Carnegie during the relevant time

period.  Moreover, it is clear that Mr. Glase had the power to exercise control over the Canal Fulton

branch office and all employees who worked there. John Glase has owned and operated Carnegie since February, 1997. He has been president of Carnegie for that entire period. (Tr. 634, Glase) Carnegie hired about 55 brokers, although not all of them passed the required exam to become brokers. About 25 of them actually became brokers. (Tr. 702, Glase) Mr. Edwards hired the brokers and Mr. Glase trained them. After Mr. Edwards left in 2001, any necessary hiring of brokers was done by Mr. Glase. (Tr. 642, Glase) The people who were hired for the main office did not have experience in options and futures and had never been registered before. (Tr. 665, Glase) Mr. Glase trained new employees for their Series 3 exam but did not provide any additional training. (Tr. 670, Glase) It appears that neither Carnegie or Mr. Glase provided or required any ethics training beyond what could be gleaned from the Series 3 preparation. (Tr. 671-672, Glase) Audit reports of the main office and the Canal Fulton office dated April 2003 noted Carnegie did not have any evidence that its APs had completed ethics training and recommended that Carnegie should review CFTC's Statement of Acceptable Practices and Refco's policy for ethics training to ensure it is complying with ethics training guidelines and that the branch office should become more familiar with the main office written ethics training policy and procedures. (Tr. 680-81, Glase)

Mr. Glase hired Chris Masterson and John Hollenbaugh. Mr. Glase testified that he decided to open the Canal Fulton office with Mr. Hollenbaugh as manager because he knew Mr. Hollenbaugh from his prior employment with Mr. Masterson and because he had been in the business for many years and had a clean record. (Tr. 645, Glase) The people who were hired by the Branch Offices mainly had a Series 3 license and had been working in the industry for a while. Mr. Glase checked their NFA records and discussed their background with the branch managers before new employees were hired.

24

(Tr. 665-667, Glase) Mr. Glase and the main office took care of registering Canal Fulton's employees with the NFA.  Mr. Glase spoke on the telephone to Mr. Hollenbaugh almost everyday to discuss the futures and option market, compliance issues and trade recommendations.  (Tr. 644, Glase) These conversations and trade recommendations occurred throughout the period in question here when Hollenbaugh and Henshaw committed the violations of the Act.  Mr. Glase handled all customer complaints for all offices, including Canal Fulton. (Tr. 645, Glase) Mr. Hollenbaugh informed Mr. Glase of all verbal customer complaints over the phone and faxed all written customer complaints to Mr. Glase for handling. (Tr. 557, Hollenbaugh)  Mr. Glase placed all orders for trades for the main office and occasionally for Branch Offices.  Branch managers also placed orders for trades for branch office customers.  All opening account documents for all of Carnegie's offices came to Mr. Glase before being sent to Refco. (Tr. 645-47, Glase) Mr. Glase was the only signatory on the contracts with LFG, Refco and Man Financial.  Mr. Hollenbaugh understood that Mr. Glase was his boss.  (Tr. 556, Hollenbaugh) Mr. Glase reviewed and approved Mr. Hollenbaugh's correspondence with the NFA regarding the response to the NFA's January 2003 letter of findings from its October 2002 audit of the Canal Fulton office before it was sent to the NFA.  While Mr. Glase claims that the Canal Fulton office was completely autonomous, even this brief review of the evidence shows that was not the case.  Mr. Glase had general control over Carnegie and its branches, including the Canal Fulton branch, and exercised that control on a regular basis.

Moving on to the second element of good faith, the CFTC contends that it made the required showing that Mr. Glase failed to act in good faith because he failed to maintain a reasonably adequate system of control and supervision by allowing Carnegie employees to distribute a fraudulent S&P e-

mini advertisement and make misrepresentations to customers and potential customers that they could earn substantial profits with minimal risk in a short period of time when year after year 74% to 94% of Carnegie's customers lost money. Mr. Glase counters that he did not have actual or constructive knowledge of the core activities that constituted the violations at issue and permit them to continue. However, Mr. Henshaw testified that he was instructed by Mr. Hollenbaugh to recommend a trading program in cocoa futures to customers and to guarantee those customers that they would break even or earn a profit if they followed the recommended cocoa trades. It was Mr. Henshaw's understanding that these instructions came from Mr. Glase. (Tr. 458-459, Henshaw) Carnegie customers Herner, Hoyt, Gore and Lindsey invested in the cocoa trades as recommended by Mr. Henshaw. Mr. Henshaw told them they could not lose money, did not discuss a stop loss provision and did not inform them of any possibility of margin calls. All four customers suffered margin calls that they were unable to cover as a result of the investment. (Tr. 458-460, Henshaw) When asked about these cocoa trades at trial, Mr. Hollenbaugh testified that he discussed these cocoa trades with Mr. Glase in October or November 2002. Mr. Glase told him that he could tell customers that they could not lose money on the trades if they were held to expiration. Mr. Glase did not mention any stop loss orders in connection with the trades or warn him that margin calls might have to be made. (Tr. 579-581, Hollenbaugh).

Further, both Mr. Hollenbaugh and Mr. Henshaw testified that they received the information regarding the Cadbury trading program from Mr. Glase. Based on that information Mr. Hollenbaugh and Mr. Henshaw represented to customers that Cadbury averaged 300 points trading the S & P index for a period of years and that a customer could infer that the Cadbury program had returned a 300% return in a year. (Tr. 454, 456-57 Henshaw; Tr. 571-573, Hollenbaugh)

26

These misrepresentations made to customers by Mr. Henshaw and/or Mr. Hollenbaugh are part of the violations of the Act at issue here.  While there is no evidence that Mr. Glase knew precisely what Mr. Hollenbaugh or Mr. Henshaw told customers, the evidence supports a finding of constructive knowledge on the part of Mr. Glase of the types of representations being made by Henshaw and Hollenbaugh, *i.e*., "the core activities that constituted the violation of the Act."  Mr. Glase's instructions to Mr. Hollenbaugh skirted the edges of what is proper and it was not a giant leap to the misrepresentations made by Mr. Henshaw, which he believed were approved by Mr. Hollenbaugh and Mr. Glase.  Further, despite having the power to control the activities in the Canal Fulton branch and exercising that power on regular occasions, Mr. Glase failed to maintain a reasonably adequate system of internal supervision.  While Mr. Glase reimbursed the four customers who suffered margin calls on the cocoa trades and disciplined Mr. Henshaw, he did not take any action with respect to Mr. Hollenbaugh or make any changes in oversight or training in the Canal Fulton office to prevent similar occurrences.  Based on the evidence presented at trial, the Court finds that the Plaintiff has demonstrated that Mr. Glase failed to act in good faith with respect to the violations alleged. Accordingly, Mr. Glase is liable as a controlling person for Mr. Hollenbaugh's and Mr. Henshaw's violations of Sections 4b(a)(2)(i) and (iii), and 4c(b) of the Act and Regulation 33.10.

**II.  Count III: Violation of Commission Regulation 166.3–Failure to Supervise Diligently**

The CFTC contends that Carnegie and Mr. Glase violated Commission Regulation 166.3 by failing to supervise diligently Carnegie's APs.  Commission Regulation 166.3 provides:

Each Commission registrant, except an associated person who has no

27

> supervisory duties, must diligently supervise the handling by its partners,
> officers, employees and agents ... of all commodity interest accounts carried,
> operated, advised or introduced by the registrant and all other activities of its
> partners, officers, employees and agents ... relating to its business as a
> Commission registrant.

17 C.F.R. § 166.3.  Generally, courts have determined that Rule 166.3 requires active supervision of

accounts and personnel and imposes a duty on Commission registrants to develop procedures for the

detection and deterrence of possible wrongdoing by the registrant's agents.  *CFTC v. Trinity*

*Financial Group, Inc*., Comm. Fut. L. Rep. (CCH) ¶27,179 (S.D. Fla. 1997).  However, Rule 166.3

does not create a private right of action or impose a general duty to police the trading in every account

carried by a brokerage firm.  *Bennett v. E.F. Hutton Co.*, 597 F. Supp. 1547 (N.D. Ohio 1984).

Thus, in order to evaluate whether a claim of failure to supervise has been demonstrated by the CFTC,

a court must first determine whether there was a program of supervision designed to detect violations

and secondly, whether the relevant policies and procedures were followed.  See *CFTC v. Matrix*

*Trading Group, Inc.*, Comm. Fut. L. Rep. (CCH) ¶29,191 (S.D. Fla. 2002).

Carnegie's program of supervision for the Canal Fulton office consisted of hiring Mr.

Hollenbaugh as branch manager, having Mr. Glase visit the Canal Fulton office three times between July

2002 and September 2003 and maintaining an NFA Rulebook, Refco Compliance Manual, anti-money

laundering policy and privacy policy in the Canal Fulton office.  These actions did not constitute an

adequate program of supervision because there were no meaningful controls in place at Canal Fulton to

detect and deter Carnegie's APs from committing the violations which occurred in this case–making

misleading and fraudulent statements to customers and potential customers and the circulation of

misleading or fraudulent written materials.  First, Mr. Hollenbaugh was certified as a branch manager

but had no management or compliance experience before becoming branch manager of Carnegie. (Tr. 535-537, Hollenbaugh).  Second, while the Canal Fulton office did maintain an NFA Rulebook, Refco Compliance Manual, an anti-money laundering policy and a privacy policy in the Canal Fulton office, none of the APs were required to read or review the materials.  Both Anthony Harris and Reid Henshaw testified that they had never read them nor were they instructed to read them.  (Tr. 336-337, Harris; Tr. 442-443, 483, Henshaw; Tr. 641, Glase).  Third, Mr. Glase did not provide any sales, compliance, or ethics training to the Canal Fulton office employees.  There was no evidence that any Canal Fulton employee received ethics training after 1999.  Mr. Glase testified that he listened to the Canal Fulton employee's telephone sales solicitations during his three visits and "heard nothing amiss." No other witness besides Mr. Glase remembers any such monitoring. (Tr. 338, Harris; Tr. 447, Henshaw; Tr. 564-565, Hollenbaugh; Tr. 748-749, Glase).  Finally, neither Mr. Glase nor any other element of the supervisory controls allegedly in place at Carnegie prevented the violations that occurred at the Canal Fulton office.  These violations were of a nature that they should have been detected by a diligent system of supervision.  Accordingly, the Court finds that the CFTC has met its burden on its failure to supervise claim under Regulation 166.3 in that Mr. Glase failed to develop and install procedures for the detection and deterrence of possible wrongdoing by their agents.

## III.  Relief

The CFTC seeks imposition of a permanent injunction, restitution, disgorgement of profits and the imposition of a civil monetary penalty.  The Court will address each form of relief requested in turn.

### A. Injunctive Relief

29

The CFTC seeks a permanent injunction against Carnegie and Mr. Glase enjoining them from committing future violations of the Act. Plaintiff notes that actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence.  Rather, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations . . . . When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct.  *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), cert. denied, 442 U.S. 921 (1979).

In this case the violations were committed by Mr. Hollenbaugh and Mr. Henshaw.  Mr. Glase has been found to be liable as a controlling person and for failing to supervise.  Mr. Hollenbaugh and Mr. Henshaw are already permanently restrained, by consent, from engaging in commodity futures and options trading.  The Canal Fulton office has been closed.  Based upon the evidence adduced at trial, it appears that the activities in the Canal Fulton office, which occurred over a 12-16 month period, were an isolated blight on Mr. Glase's 30 plus year career in commodity trading, rather than a long lasting systematic course of conduct.  Given Mr. Glase's long, violation free career in the industry and the fact that the actual wrong doers have been enjoined and the office closed, there is no reasonable likelihood of future violations if Carnegie and Mr. Glase are not enjoined.  Accordingly, the Court declines to impose injunctive relief.

## B.  Restitution

The CFTC seeks restitution for 41 former Carnegie customers as set forth in Plaintiff's Exhibit 82-1(revised).  Mr. Tallarico, the CFTC investigator who compiled Exhibit 82-1(revised), testified that

30

the Exhibit 82-1(revised) is a list of the profits/losses of 41 Carnegie customers whose trades were all or mostly recommended by Carnegie, or were placed without their consent. (Tr. 233, 235, Tallarico). The losses listed on Exhibit 82-1(revised) total $865,118.47.  Mr Tallarico determined that these customers relied on Carnegie's trade recommendations or that their accounts were traded without their consent through surveys and interviews.  The actual surveys and other documentation of interviews were not submitted into evidence at trial.  Thus, except for the customers who testified at trial, there is no way for the Court to determine if the customers listed in Exhibit 82-1(revised) dealt with Mr. Hollenbaugh or Mr. Henshaw or if they were the victim of any of the conduct that has been determined to have violated the Act.  The bare fact that they have lost money trading commodities and or futures with Carnegie does not entitle them to restitution.  Accordingly, the Court will grant restitution only to those customers who testified at trial that they were mislead by Mr. Hollenbaugh and/or Mr. Henshaw regarding profit potential and risk of loss, that they relied on those misstatements and or omissions and lost money on the trades.[5]

The following witnesses with the following losses were included on Plaintiff's Ex.82-1(revised):

| | |
|---|---|
| Deyoung, Richard | $30,521.75 |
| Herner, Christopher | $ 4,000.00 |
| Hoyt, Michael | $26,835.27 |
| Lively, Alan Brett | $11,137.90 |
| Media Solutions Inc., (Lucas Knowles) | $ 6,371.48 |
| Mercer, Johnny | $46,766.75 |
| Tucker, Clarence/Melissa | $ 8,933.96 |

---

[5]

The Court declines to adopt Plaintiff's suggestion that the Court hold another proceeding where former Carnegie customers could appear to testify regarding their dealings with Carnegie.  In addition to the question of reliance, the Court would be required to reexamination the issue of liability with respect to each customer.

| | | |
|---|---|---|
| Vanhoy, Tom | | $14,581.78 |
| Werner, Melvin | | $80,822.42 |
| | Total: | $229,971.31 |

One former Carnegie customer who testified at trial is not listed on Plaintiff's Ex. 82-1(revised). David Kreamer opened an account with Carnegie after being called by Mr. Henshaw in August 2002. Mr. Kreamer actually made a profit on his trades and withdrew his original $6000 investment along with $2,700 in profits.

Defendants contend that Mr. Herner and Mr. Lively placed their own trades and that Mr. Vanhoy considered himself an expert in soybeans.  Further, Mr. Knowles, another soybean/corn expert, did self research and rejected all of Carnegie's recommendations except for soybeans and corn. Accordingly, Defendants contend that these witnesses are not entitled to restitution.

The $4,000 loss listed next to Mr. Herner on Plaintiff's Ex. 82-1(revised) takes into consideration the reimbursement he received from Carnegie and Refco.  The restitution to Mr. Herner is warranted despite his signing of a release in favor of Carnegie and Refco because the Commission was not part of the earlier settlement and did not give its consent.   While Mr. Knowles rejected many of Carnegie's recommendations, he did invest pursuant to Carnegie's recommendations for trades in soybeans and corn.  Similarly, while Mr. Vanhoy felt he knew something about soybeans, he relied on Carnegie's recommendations to make trades in those markets.  Finally, Mr. Lively testified that he followed Carnegie's recommendations for the most part.  Thus, the Court finds that a restitution award in the amount of $229,971.31 is warranted in this matter.

**C.  Disgorgement**

District courts may order disgorgement as a remedy for violations of the Act in order to deprive the wrongdoer of his ill-gotten gains and to deter violations of the law. *CFTC v. American Metals Exchange Corp.*, 991 F.2d 71, 76 (3rd Cir. 1993); *CFTC v. British Am. Commodity Corp.*, 788 F.2d 92, 94 (2d Cir. 1986). Plaintiff seeks disgorgement of all of Carnegie's and Mr. Glase's earnings from February, 1997 through December 2003 in the amount of $138,000. (Plaintiff's Ex. 75) The wrongdoing at issue in this case, however, occurred during the period from July 2002 through January 2003 when Mr. Hollenbaugh and Mr. Henshaw were at work in the Canal Fulton office. The only testimony regarding any violation during any period predating July 2002 was the testimony of Mr. Lively and Mr. Mercer. Mr. Lively testified that he was contacted by Mr. Edwards in 2001 and Mr. Mercer stated that he was contacted by Mr. Hollenbaugh in November 1999 but was not induced to open an account until February 2000 when Mr. Hollenbaugh began telling him he could double his investment in a short period of time. According to Plaintiff's Ex. 75, Mr. Glase earned $32,600 in 2000, $250.00 in 2001 and nothing in 2002. There is no information regarding 2003. The Court declines to order disgorgement for any period where no wrongdoing occurred. Accordingly, disgorgement will be ordered for earnings in 2000-2003. According to Plaintiff's Ex. 75 that amount is $32,850.00.

**D.  Civil Monetary Penalty**

Section 6c(d)(1) of the Act, 7 U.S.C. §9(d)(1), provides that a civil penalty may be assessed against a defendant for each violation of the Act. The CFTC recommends that Carnegie and Mr. Glase should be ordered to pay a civil monetary of $414,000 which represents triple the total monetary

benefit to them–3 x $138,850. (Plaintiff's Ex. 75)  Following, the CFTC's recommendation in part, the Court will order a civil monetary penalty in the amount of $98,550.00–three times the $32,850 disgorgement amount.

## CONCLUSION

For these reasons, the Court finds that Mr. Hollenbaugh and/or Mr. Henshaw have violated the Act with respect to their dealings with Mr. Knowles, Mr. Tucker, Mr. Herner, Mr. Vanhoy, Mr. Deyoung, Mr. Werner, Mr. Hoyt, Mr. Kreamer and Mr. Mercer.  Carnegie is liable for these violations under Section 2(a)(1)(B) of the Act and Mr. Glase is liable for the violations as a controlling person. Mr. Glase further violated Commission Regulation 166.3 by failing to supervise Mr. Hollenbaugh and Mr. Henshaw with the required diligence.  The Court will enter judgment in accordance with these findings and will order Carnegie and Mr. Glase to pay restitution in the amount of $229,971.31; disgorge earnings in the amount of $32,850 and pay a civil monetary penalty of $98,550.00.

IT IS SO ORDERED.

s/Donald C. Nugent
JUDGE DONALD C. NUGENT

DATED:  June 27, 2006

34